# United States Court of Federal Claims

No. 11-462 C
July 31, 2012

| | |
|---|---|
| **BELL/HEERY, A JOINT VENTURE,** *Plaintiff,* v. **UNITED STATES OF AMERICA,** *Defendant.* | Contract Disputes Act; RCFC 12(b)(6); breach of contract; implied covenant of good faith and fair dealing; constructive change; cardinal change |

*Robert D. Windus*, Moore & Lee, LLP, McLean, VA, for plaintiff.

*Devin A. Wolak*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant.

## OPINION *and* ORDER

**Block,** *Judge.*

The Federal Bureau of Prisons ("FBOP" or the "Bureau of Prisons") contracted to have plaintiff design and build a federal correctional institution in the state of New Hampshire. The New Hampshire state government proved resistant to plaintiff's efforts to fulfill the contract. To satisfy state officials, plaintiff was forced to incur costs it did not expect. Understandably miffed, plaintiff sued its contract partner, the United States. The United States, in turn, filed a motion to dismiss for failure to state a claim upon which relief may be granted. *See* Rule 12(b)(6), Rules of the United States Court of Federal Claims ("RCFC"). That motion is now before the court.

The central problem in this case may be summarized in a word: risk. Specifically, how does a contract allocate risk when performance is frustrated by the actions of a non-party?

The short answer is that, although the common law permits relief from performance in certain circumstances, how risk is allocated is ultimately up to the parties themselves. *See RNJ Interstate Corp. v. United States*, 181 F.3d 1329, 1331 (Fed. Cir. 1999) ("[T]he common law doctrine is a default and does not apply where the parties have agreed, by the terms of their contract, to a different allocation of risks."); 30 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 77:54 (4th ed. 2012) ("Although a party can obtain relief . . . performance has become impracticable, a *sine qua non* is that performance must have been rendered impracticable . . . without an assumption of risk by the party seeking relief."). Each

<pre>
party here claims that the other party assumed the risk of the costs imposed by the New Hampshire state officials.
</pre>

party here claims that the other party assumed the risk of the costs imposed by the New Hampshire state officials.

Defendant argues that it was plaintiff who bore the risk because a provision of the contract assigned "[t]he Contractor" the responsibility of complying with all state laws, regulations, and permitting requirements "without additional expense to the Government." 48 C.F.R. ("FAR") § 52.236-7. Plaintiff argues, however, that defendant had a duty to intercede on plaintiff's behalf when the state of New Hampshire's interference became onerous. Because defendant did not follow through on this duty to intercede, plaintiff argues, it should bear the costs imposed by New Hampshire's alleged meddling—notwithstanding the contract's apparent allocation of responsibility for complying with state law to plaintiff.

In addressing the burden of risk, the court must keep in mind the standards that govern a RCFC 12(b)(6) motion. Specifically, it is plaintiff's responsibility to point out what contractual term or terms, express or implied, gave rise to defendant's alleged "duty to intercede"—and to set forth well-pleaded facts which, if true, would entitle plaintiff to relief. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

As the court will explain below, plaintiff has failed to identify any contractual basis for concluding that defendant bore the risk of additional costs of complying with New Hampshire law. Indeed, the contract rather clearly allocates that risk to plaintiff, and does so "without additional expense to the Government." Accordingly, for the reasons stated below, the court will grant defendant's motion to dismiss.

**I. Facts**

**A. The Contract**

In April 2006, the Bureau of Prisons issued a solicitation for the "design-build" construction of a federal correctional institution known as FCI Berlin, to be located in Berlin, New Hampshire. On or about May 2, 2007, plaintiff was awarded the contract to design and build FCI Berlin for a base sum of $238,175,000. Compl. ¶ 5.

Although neither party has provided the court with a copy of the complete contract, plaintiff alleges (and defendant does not deny) that the contract set forth a schedule for completion. According to plaintiff, the contract provided that FCI Berlin was to be completed 1,120 calendar days after FBOP issued a Notice to Proceed ("NTP"). Compl. ¶ 6. The NTP was issued effective May 16, 2007, thus fixing June 10, 2010 as the Final Completion date. Compl. ¶ 6. The contract also required "Substantial Completion" of FCI Berlin 90 days prior to Final Completion. Compl. ¶ 7. If plaintiff failed to complete the work within the agreed timeframe, FBOP was entitled to assess liquidated damages of $8,000 for every day completion was overdue. Compl. ¶ 8.

In addition to providing a timeframe for completion, the contract contemplated that the design and construction of FCI Berlin would require obtaining certain permits from the state of New Hampshire, as well as complying with various state laws and regulations. In recognition of this fact, the contract contains several terms allocating risks and responsibilities associated with obtaining those permits and complying with those laws and regulations. Defendant has helpfully

2

supplied excerpts of these provisions, and plaintiff does not deny that the excerpts are genuine and complete.

For example, the contract sets forth a series of "Technical Design Guidelines" ("TDG"), one of which provides "guidance to ensure that the Contractor obtains, reads, and complies with the terms and conditions of applicable permits, construction regulations, and building codes and standards." Def.'s Mot. Ex. A6 ("TDG Section 01415"). Within TDG Section 01415 is a provision entitled "STATE AND LOCAL GOVERNMENT CONSULTATION, REVIEW AND INSPECTION." TDG Section 01415(D)(1). It delineates several duties plaintiff ("the Contractor") was to perform "in conjunction with" FBOP. Those duties included consulting with state officials in "preparing the design for the project," allowing inspections by state officials, and giving "due consideration to . . . recommendations" made by state officials. Another provision within TDG Section 01415, entitled "PERMITS," assigned plaintiff the responsibility for "identify[ing] all permits, licenses, registrations, or certificates required for construction," as well as for "comply[ing] with all terms and conditions of permits, licenses, registration, and certificates." TDG Section 01415(F)(1).

In addition to these duties, incorporated by reference were several provisions of the Federal Acquisition Regulations (the "FAR"). Def.'s Mot. Ex. A1-4. Among the provisions incorporated by reference was FAR § 52.236-7 (the "Permits and Responsibilities Clause"), which provides:

> The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for complying with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work. The Contractor shall also be responsible for all damages to persons or property that occur as a result of the Contractor's fault or negligence. The Contractor shall also be responsible for all materials delivered and work performed until completion and acceptance of the entire work, except for any completed unit of work which may have been accepted under the contract.

With these contractual provisions in mind, the court now turns to the facts giving rise to the dispute in this case.

**B. The Design and Construction of FCI Berlin**

The facts giving rise to the parties' dispute concern the efforts of plaintiff and its subcontractors to comply with New Hampshire state permit requirements, as well as their subsequent efforts to comply with directives of state officials. One of the permits required by the New Hampshire Code of Administrative Rules was an Alteration of Terrain ("AOT") Permit, issued by the New Hampshire Department of Environmental Services ("NHDES"). Compl. ¶ 21. New Hampshire required the AOT Permit because construction of FCI Berlin would entail significant changes to the land. Compl. ¶ 21.

3

According to the complaint, on July 27, 2007, plaintiff, acting as "agent" for the Bureau of Prisons,[1] submitted an application for an AOT Permit through its subcontractor, Tetra Tech Rizzo. Compl. ¶ 23, Ex. 1; Pl.'s Opp. Ex. 1. Accompanying the application was a "Phasing Plan,"[2] developed based on information provided in the solicitation documents as well as the experience of plaintiff and its subcontractors. Compl. ¶¶ 24, 25. According to plaintiff, the Phasing Plan allowed for the project to move forward both in accordance with both state regulations and industry standards and in such a manner so as to permit efficient use of cut-to-fill materials. Compl. ¶ 26.

On September 5, 2007, representatives of plaintiff and its subcontractors met with representatives of FBOP and two representatives of NHDES—Ridge Mauck and Denise Frappier. Compl. ¶ 32. Mauck and Frappier advised plaintiff that the AOT Permit would authorize a "disturbance area"[3] limited to forty acres. Compl. ¶ 33. On September 10, 2007, NHDES issued the AOT Permit. Compl. ¶ 34. Based on revisions to the Phasing Plan made due to the forty-acre limitation, a revised AOT Permit, authorizing the first phase of construction, was then issued on September 13, 2007. Compl. ¶ 36. The building of FCI Berlin was set to commence.

It was then that the most significant troubles began. In plaintiff's telling, NHDES—and particularly Frappier—"proceeded upon a course of action that devastated efficient and effective performance of the site work." Compl. ¶ 37. For instance, plaintiff alleges that Frappier arrived on site and directed that the area of disturbance be further restricted and that the first phase of construction be divided into two separate operations—one conducted at the "work area," the other conducted at the "road entrance." Compl. ¶ 38. Because of this division, plaintiff alleges that "Frappier would not allow materials to be cut from one area then directly filled into the planned fill area." Compl. ¶ 40. Plaintiff also alleges that Frappier caused ten amendments to be made to the AOT Permit. Compl. ¶ 50. Plaintiff alleges that Frappier's actions were "not in accordance with the previously approved AOT Permit," were "contrary to generally accepted industry practice," and "resulted in extremely inefficient performance of work." Compl. ¶¶ 39, 42, 51, 52, 54, 55.

Plaintiff alleges that despite repeated notice of the actions of Frappier and NHDES, the Bureau of Prisons "never made any effort to engage NHDES, or to otherwise resolve the problems caused by NHDES' multiple changes to the Phasing Plan." Compl. ¶¶ 57, 63. Plaintiff

---

[1] The application permit named FBOP as the "owner" or "applicant" and plaintiff as the "desired permit holder." Compl. ¶ 23, Ex. 1; Pl.'s Opp. Ex. 1.

[2] The "Phasing Plan" was a series of documents and drawings setting forth the design of FCI Berlin and contemplating construction in "phases." Compl. ¶ 24. The original Phasing Plan contemplated work in four phases, but the revised plan had only two phases. Compl. ¶¶ 24, 36.

[3] Although this term is never fully explained in any of the pleadings and memoranda, the court gathers that the "disturbance area" refers to the geographical area whose landscape and environment was to be affected by construction of FCI Berlin.

alleges that as a result of FBOP's failure to intercede, plaintiff and its subcontractors "had no choice" but to accede to NHDES's "arbitrary and unreasonable" actions. Compl. ¶ 66.

On September 1, 2009, plaintiff submitted a request for equitable adjustment ("REA") on behalf of it and some of its subcontractors. Compl. ¶ 72. The REA was for a total amount of $8,210,734. Compl. ¶ 72. On November 13, 2009, FBOP rejected the REA, citing F.A.R. § 52.236-7 (the "Permits and Responsibilities Clause"), which assigns the burden of obtaining state permits and complying with state law to the contractor "without additional expense to the Government." Compl. ¶ 73.

Thereafter, on December 21, 2009, plaintiff submitted additional information in support of its REA. Compl. ¶ 74. Plaintiff alleges that "FBOP, acting through Pamela Tharp and Cy Zinn advised [plaintiff] that its claim had merit and that it would be treated fairly." Compl. ¶ 75. However, on April 6, 2010, FBOP once again rejected plaintiff's REA. Compl. ¶ 76. Plaintiff then submitted a revised REA for $7,724,885, focusing on additional work performed by its subcontractor Alvin J. Coleman & Son, Inc. ("Coleman") as a result of the actions of NHDES. Compl. ¶ 77. On September 7, 2010, FBOP, acting through the Contracting Officer, issued a final decision rejecting plaintiff's REA in its entirety. Compl. ¶¶ 79, 80.

Plaintiff filed a complaint in this court on July 15, 2011. In it, plaintiff seeks review of the contracting officer's denial of the REA. Plaintiff alleges that defendant breached the express terms of the contract as well as the implied covenant of good faith and fair dealing. Finally, plaintiff requests relief under the doctrines of constructive and cardinal change. Defendant filed the instant RCFC 12(b)(6) motion on November 4, 2011. Plaintiff filed an opposition on December 15, 2011, and defendant filed a reply on January 23, 2012.

## II. Jurisdiction and Standards

The Tucker Act, 28 U.S.C. § 1491(a)(1), waives the United States' sovereign immunity in non-torts suits based on the Constitution, a statute or regulation, or an express or implied contract with the United States. However, although the Tucker Act confers on this court jurisdiction to hear such cases, it does not create any substantive right to relief. *United States v. Testan*, 424 U.S. 392, 398 (1976). Thus, a plaintiff seeking relief must base its claim on a separate money-mandating source of law. *James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998). Here, plaintiff asserts a right to relief under its contract with FBOP. The Contract Disputes Act ("CDA"), 41 U.S.C. § 7104(b)(1), permits plaintiff to assert such a right to relief in this court without first appealing the contracting officer's decision to the relevant agency board.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). In addition to the complaint itself, the court may consider its exhibits. *See* RCFC 10(c) ("A copy of a written instrument that is an exhibit to a pleading is part of the pleading for all purposes.")

A complicating matter arises in this case because plaintiff did not attach a copy of the contract itself to the complaint. Apparently realizing that not having the contract would make it difficult for the court to adjudicate a RCFC 12(b)(6) motion, defendant provided the court with excerpts of the contract. It also provided the court with an excerpt of the New Hampshire Code

of Administrative Rules, and excerpts of plaintiff's April 8, 2010 CDA claim. The seeming difficulty with all this is that RCFC 12(d) provides that where an RCFC 12(b)(6) motion to dismiss relies on materials outside the pleadings, it is to be treated as a motion for summary judgment.

In this case, however, the court need not convert defendant's motion to dismiss into a motion for summary judgment. It is well established that, in addition to the complaint itself and exhibits thereto, the court "must consider . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (citing 5B Wright & Miller § 1357 (3d ed. 2004 and Supp. 2007)); *see also Montana v. United States*, 33 Fed. Cl. 82, 88 n.4 (1995). Moreover, "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint relies heavily upon its terms and effect, which renders the document integral to the complaint." *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006) (quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)); *see also Perry v. New England Bus. Serv., Inc.*, 347 F.3d 343, 345 n.2 (1st Cir. 2003) ("Where . . . 'a complaint's factual allegations are expressly linked to—and admittedly dependent upon—a document (the authenticity of which is not challenged), that document effectively merges into the pleadings and the trial court can review it in deciding a motion to dismiss under [Fed. R. Civ. Proc.] 12(b)(6).'" (quoting *Beddall v. State St. Bank & Trust Co.*, 137 F.3d 12, 17 (1st Cir. 1998))); *Cnty. of Santa Fe, N.M. v. Pub. Serv. Co. of N.M.*, 311 F.3d 1031, 1035 (10th Cir. 2002) ("[T]he district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity.") (quoting *Jacobsen v. Deseret Book Co.*, 287 F.3d 936, 941 (10th Cir. 2002)). All the materials defendant has submitted are either specifically referenced in the complaint or are integral to it. Because plaintiff does not dispute the authenticity of any of these documents, the court will consider them without converting this motion to dismiss into a motion for summary judgment.

### III. Discussion

The question before the court is whether plaintiff has stated claims upon which relief may be granted. In its complaint, plaintiff sets forth six counts detailing four theories of relief. First, in Counts I and II, plaintiff alleges that the contracting officer's denial of the requests for equitable adjustments was erroneous. Second, in Count III, plaintiff alleges that defendant breached an express provision of the contract. Third, in Court IV, plaintiff alleges that defendant breached the implied covenant of good faith and fair dealing. Fourth, in Counts V and VI, plaintiff alleges that it is entitled to relief under the doctrines of constructive and cardinal change. For the reasons stated below, the court holds that plaintiff has failed to state a claim for relief on each of these theories.

**A. Counts I and II: Review of Contracting Officer's Denial of REAs**

In Counts I and II, plaintiff urges this court to "review" the contracting officer's denial of plaintiff's and Coleman's REAs. In particular, with respect to the contracting officer's denial of plaintiff's REA, plaintiff alleges in its complaint that the contracting officer's decision was "unreasonable, an abuse of discretion, and/or not in accordance with the terms of the Contract and the relevant law and facts." Compl. ¶ 84.

These are not claims upon which relief may be granted. The CDA does not permit plaintiff to seek "review" of a contracting officer's decision in this court. Rather, "in lieu of appealing the decision of a contracting officer . . . to an agency board, a contractor may bring an action *directly on the claim* in the United States Court of Federal Claims, notwithstanding any contract provision, regulation, or rule of law to the contrary." 41 U.S.C. § 7104(b)(1) (emphasis added). In other words, plaintiff is authorized to claim relief under the contract in this court, but plaintiff is not authorized to seek "review" of the contracting officer's decision to reject these claims. *Cf. Wilner v. United States*, 24 F.3d 1397, 1401-02 (Fed. Cir. 1994) (holding that in CDA litigation "a contractor is not entitled to the benefit of any presumption arising from the contracting officer's decision" because "once an action is brought following a contracting officer's decision, the parties start in court . . . with a clean slate.").

This court hears suits "directly on the claim," not appeals of contracting officers' decisions.[4] Accordingly, Counts I and II of plaintiff's complaint, seeking review of the contracting officer's denial of an equitable adjustment, fail to state claims upon which relief may be granted. They must therefore be dismissed.

**B. Count III: Breach of Contract**

In Count III, plaintiff alleges that defendant breached the contract by failing to intercede in order so as to "resolve the problems" caused by NHDES's actions, and by failing to compensate plaintiff and Coleman for expenses incurred as a result of those actions. Defendant, in turn, argues that plaintiff has failed to identify a provision of the contract imposing on defendant a duty or obligation to intercede in the manner requested.

To state a claim for relief for breach of contract, a plaintiff must identify, *inter alia*, an obligation or duty arising out of the contract and facts sufficient to establish a breach of that duty. *Hercules, Inc. v. United States*, 24 F.3d 188, 198 (Fed. Cir. 1994); *San Carlos Irrigation & Drainage Dist. v. United States*, 877 F.2d 957, 959 (Fed. Cir. 1989); *see also Metcalf Const. Co. v. United States*, 102 Fed. Cl. 334, 346 (2011). The only express provision of the contract on which plaintiff relies for its breach of contract claim is TDG Section 01415(D)(1), specifically subsections (a), (e), and (f).[5] The court must interpret these provisions in order to ascertain whether the facts plaintiff alleges would, if true, establish a breach of contract. *See S. Cal. Edison v. United States*, 58 Fed. Cl. 313, 321 (2003) ("Contract interpretation is a matter of law and thus may be addressed by the Court in resolving a motion to dismiss.") (citing *Kennedy Heights Apartments, Ltd., I v. United States*, 48 Fed. Cl. 574, 578 (2001)).

---

[4] Rather, the contracting officer's final decision is relevant only insofar as it is a jurisdictional prerequisite for a CDA suit. *See M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327-28 (Fed. Cir. 2010).

[5] In its complaint, plaintiff obliquely suggests that defendant's duty to intercede may also be rooted in a provision of the solicitation, RFP section C.4(e). Compl. ¶ 13. However, in responding to defendant's motion to dismiss, plaintiff does not rely on RFP section C.4(e) at all. This effectively concedes that (as defendant argues) RFP section C.4(e) does not apply. *See Cardiosom, LLC v. United States*, 91 Fed. Cl. 659, 664 (2010).

"Contract interpretation beings with the language of the written agreement." *Coast Fed. Bank, FSB v. United States*, 323 F.3d 1035, 1038 (Fed. Cir. 2003) (citing *Foley Co. v. United States*, 11 F.3d 1032, 1034 (Fed. Cir. 1993)). Thus, "if the 'provisions are clear and unambiguous, they must be given their plain and ordinary meaning.'" *McAbee Const., Inc. v. United States*, 97 F.3d 1431, 1435 (Fed. Cir. 1996) (quoting *Alaska Lumber & Pulp Co. v. Madigan*, 2 F.3d 389, 392 (Fed. Cir. 1993)). Of course, no provision should be read in isolation. Rather, a contract ought to be read as a whole and "in a manner that gives meaning to all of its provisions and makes sense." *Id.* (citing *Hughes Commc'ns Galaxy, Inc. v. United States*, 998 F.2d 953, 958 (Fed. Cir. 1993)).

It is true that when the contract read as a whole is not clear and unambiguous, "the court will construe the ambiguous term against the drafter of the contract when the nondrafter's interpretation is reasonable." *Hills Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed. Cir. 1992). But the mere fact that the parties disagree as to a matter of interpretation "does not necessarily render [the clause or provision] ambiguous so as to require that it be construed against the drafter." *Cmty. Heating & Plumbing Co., Inc. v. Kelso*, 987 F.2d 1575, 1579 (Fed. Cir. 1993) (citing *Ace Constr. Co. v. United States*, 401 F.2d 816, 820, 185 Ct. Cl. 487 (1968)). Rather, a contract is ambiguous only if it is "susceptible of two different interpretations, each of which is found to be consistent with the contract language." *Id.*

The language of TDG Section 01415(D)(1) is unambiguous, and it plainly did not impose on defendant a duty to intercede in plaintiff's dispute with NHDES. The provision reads, in pertinent parts,

> The Contractor shall perform the following in conjunction with the FBOP Project Management Team:
>
> a. In preparing the design for the project, consult with appropriate officials of the State or a political subdivision of a State, or both, in which the project is located and who would have jurisdiction over the project if it were not a project constructed or altered by a federal agency.
>
> ***
>
> e. Allow inspections by such officials during construction of the project, in accordance with the customary schedule of inspections for construction of alteration of projects in the locality. Scheduled inspections may take place if such officials provide to the Bureau a copy of the schedule before construction of the project has begun and provide reasonable notice of their intention to conduct any inspection before conducting such inspection.
>
> f. These appropriate officials may make recommendations to the Bureau concerning measures necessary to meet these requirements. Such officials may also make recommendations concerning measures which should be taken in the construction or alteration of the project to account for local conditions. Contractors, in

>conjunction with the Bureau's Project Management Team, are to give due consideration to such recommendations and ensure that a written response is made to them.

The plain language of the TDG Section 01415(D)(1) does not impose "an obligation or duty" on *defendant* at all. The language imposing an obligation ("The *Contractor* shall perform" (emphasis added)) imposes that obligation on *plaintiff*, not defendant. It follows that TDG Section 01415(D)(1) cannot serve as the basis for plaintiff's breach of contract claim—it does not impose "an obligation or duty" capable of being breached by *defendant*.

Despite this, plaintiff maintains that because it could only perform the duties of TDG Section 01415(D)(1) "in conjunction with" defendant, the clause should be read as imposing on defendant a duty to act "in conjunction" with plaintiff. Pl.'s Opp. at 13-14. In the alternative, plaintiff maintains that such an interpretation is at least "reasonable," requiring the court to construe TDG Section 01415(D)(1) against defendant. Pl.'s Opp. at 14.

Far from being reasonable, plaintiff's proposed interpretation would require flipping the sentence around, reading it as though it said, "The FBOP Project Management Team shall perform the following in conjunction with the Contractor . . . ." But ambiguity requires the existence of two interpretations, each "consistent with the contract language." *Kelso*, 987 F.2d at 1579. Because plaintiff's proposed interpretation requires a distortion of the contract language, it does not establish an ambiguity that should be construed against defendant. *Id.* (citing *Ace Constr. Co.*, 401 F.2d at 820).[6]

But even assuming TDG Section 01415(D)(1) imposed duties on defendant, plaintiff's claim for breach of contract would still fail. None of the duties in TDG Section 01415(D)(1) pertains to consulting with New Hampshire state officials regarding the actual *construction* of the federal corrections institution. Rather, subparagraph (a) pertains to a duty to "consult" with state officials *"[i]n preparing the design for the project."* (emphasis added). Plaintiff does not allege that defendant failed to consult with state officials "[i]n preparing the design for the project," but instead alleges that defendant failed to consult with state officials during the actual *implementation* of the already-prepared design. Thus, even if TDG Section 01415(D)(1)(a) were capable of being breached by defendant, plaintiff has not alleged facts to establish such a breach.

Indeed, throughout its complaint, plaintiff makes clear that the troubles supposedly requiring defendant's intercession occurred in the actual *construction* of the prison, rather than in the design *preparation*. For instance, plaintiff alleges that Frappier's interference began "[d]uring performance of the Phase I site work." Compl. ¶ 38. Moreover, plaintiff alleges that the nature of Frappier's interference affected not the "design for the project" (let along the "preparation" for that design), but only "the planned means and methods of performance." Compl. ¶ 51. Plaintiff also alleges that NHDES made the transportation of materials to the work site more difficult, made the excavation of a building pad less efficient, and

---

[6] The court considers below whether defendant's alleged failure to consult with NHDES "in conjunction with" plaintiff would establish a breach of the implied covenant of good faith and fair dealing.

9

> caused excessive re-handling and handling of materials, increased equipment and manpower needs, caused problematic stockpile management, required additional import materials, increased costs for erosion control measures, added temporary stabilization areas, required temporary stockpile stabilization, required additional areas of restoration and rework and necessitated work during unanticipated winter weather conditions.

Compl. ¶ 55. Plainly, these problems concern construction, rather than design preparation. Moreover, every instance in which plaintiff provided defendant with notice of the "impact, obstruction, hindrance and effect" of NHDES's actions focused on the impact on construction, rather than the design or design preparation. Compl. ¶ 57. In short, even if TDG 01415(D)(1)(a) imposes a duty on defendant to consult with state officials "[i]n preparing the design for the project," plaintiff simply does not allege that defendant violated that duty.

Nor does subparagraph (e) impose any duty implicated by the facts alleged in the complaint. It requires only that state officials be permitted to conduct "inspections" during the course of the construction, if those officials provide reasonable notice. Plaintiff does not allege that defendant prevented such inspections. Nothing in subparagraph (e) imposes a duty, either on plaintiff or defendant, to object when state inspectors or other officials become too meddlesome. Moreover, subparagraph (e) applies only when state officials "provide to the Bureau a copy of the schedule before construction of the project has begun and provide reasonable notice of their intention to conduct any inspection." Plaintiff fails to allege that state officials provided the notice required for subparagraph (e) to apply at all.

Finally, nothing in plaintiff's complaint implicates subparagraph (f). That subsection provides that state officials may make "recommendations concerning measures which should be taken in the construction or alteration of the project to account for local conditions," as well as "recommendations" designed to further compliance with the other "requirements" of TDG Section 01415(D)(1). Subparagraph (f) further provides that "Contractors, in conjunction with the Bureau's Project Management Team, are to give due consideration to such recommendations and ensure that a written response is made to them." Assuming (contrary to the plain meaning rule) that this was an obligation on FBOP as well as on plaintiff, there is no allegation in the complaint that state officials made "recommendations" of the type described in subparagraph (f). Plaintiff is not complaining about FBOP's response to NHDES's "recommendations" for how to comply with requirements, it is complaining about FBOP's response to the requirements *themselves*, which (unlike "recommendations") neither plaintiff nor FBOP had the right to reject or ignore.

One additional consideration counsels against interpreting TDG Section 01415(D)(1) as imposing a duty on defendant to intercede in a dispute between plaintiff and the state of New Hampshire concerning plaintiff's AOT permit. Another subsection of the TDG—TDG Section 01415(F)(1)—*specifically deals* with construction permitting requirements. And it assigns responsibility for such permits to "[t]he Contractor" without mentioning FBOP. Subsection (D)(1) must be read in light of this provision. *See McAbee Const. Inc.*, 97 F.3d at 1435 (citing *Hughes Communications Galaxy, Inc.*, 998 F.2d at 958). It makes no sense to read the duties of subsection (D)(1)—which plaintiff was to perform "in conjunction with" FBOP—as pertaining

10

to construction permitting requirements when subsection (F)(1) *specifically deals* with construction permitting requirements and *does not* contain the "in conjunction with" language.

In short, plaintiff has failed to identify an applicable express duty or obligation as required to state a breach of contract claim upon which relief may be granted. Count III therefore fails to state a claim upon which relief may be granted. Hence, the court must dismiss it.

**C. Count IV: Breach of the Implied Covenant of Good Faith and Fair Dealing**

As an alternative to relying on an express provision of the contract, plaintiff alleges that the Bureau of Prisons breached the implied covenant of good faith and fair dealing. Compl. ¶¶ 105. Specifically, plaintiff alleges that FBOP breached the implied covenant by "ignoring" and "failing to make any effort to resolve" problems caused by NHDES's conduct, as well as by refusing to compensate plaintiff for the cost incurred as a result of those problems after promising that plaintiff would be "treated fairly with respect to the extra work." Compl. ¶¶ 101-104. Defendant argues that these allegations do not amount to a proper claim for breach of the implied covenant because the duties imposed by the implied covenant must have roots in the contract itself. Def.'s Mot. at 18-19.

Implied in every contract is a duty of good faith and fair dealing that requires a party to refrain from interfering with another party's performance or from acting to destroy another party's reasonable expectations regarding the fruits of the contract. *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005); *see also* Restatement (Second) of Contracts § 205. In the main, the implied covenant guarantees that the government will not "eliminate[] or rescind[]" contractual benefits through "action . . . specifically designed to reappropriate the benefits . . . thereby abrogating the government's obligations under the contract." *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 829 (Fed. Cir. 2010).

But, as defendant points out, the implied covenant of good faith and fair dealing is "not . . . an amorphous catch-all" designed to evade the express terms of the contract. Def.'s Mot. at 18. Nor can the implied covenant "expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Precision Pine*, 596 F.3d at 831. As the Federal Circuit recently explained, "[a]lthough the implied duty of good faith and fair dealing attaches to every contract, *what* that duty entails depends in part on what that contract promises (or disclaims)." *Id.* at 830.

This presents an insurmountable obstacle to finding that plaintiff has properly stated a claim for breach of the implied covenant. Plaintiff's argument seems to be that because it could not comply with TDG 01415(D)(1) except "in conjunction with" defendant, the implied covenant must be deemed to require defendant to intercede. *See* Pl.'s Opp. at 20. Whatever facial plausibility that argument has vanishes when one considers the Permits and Responsibilities Clause, which allocated the burden of complying with New Hampshire state law and licensing requirements entirely to plaintiff:

> The Contractor shall, without additional expense to the Government, be responsible for obtaining any necessary licenses and permits, and for

11

>    complying with any Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work.

FAR § 52.236-7.

As this court noted in *L.W. Matteson, Inc. v. United States*, 61 Fed. Cl. 296 (2004), the language of the Permits and Responsibilities Clause leaves no doubt: it "clearly and unambiguously assign[s] to the contractor the burden of obtaining any local permits," and "of complying with all applicable" local laws. *Id.* at 311. Moreover, the language clearly and unambiguously allocates this burden "without additional expense to the Government." In short, the contract expressly made plaintiff, *and only plaintiff*, "responsible" for "obtaining any necessary licenses and permits" from New Hampshire, as well as for "complying with any [New Hampshire] laws, codes, and regulations applicable to the performance of the work." Because the implied covenant cannot imply the opposite of what the contract expressly says, it cannot entail what plaintiff claims it does.

Plaintiff seeks to downplay the significance of the Permits and Responsibilities Clause by citing *Hills Materials Co.* for the proposition that "the Permits and Responsibilities Clause is not absolute, but must be applied in a manner that accounts for all of the provisions of the contract." Pl.'s Opp. at 11 (citing *Hills Materials Co.*, 982 F.2d at 515-17). But *Hills Materials Co.* offers plaintiff no help. In that case, a contractor filed a claim for increased costs incurred as a result of federal regulations promulgated after the contractor was awarded the contract. *Id.* at 515-16. The question was whether the contractor or the government bore responsibility for these increased costs. Although the contract contained the Permits and Responsibilities Clause assigning to the contractor a "general obligation" to bear the burden of complying with federal regulations, the contact also contained an "Accident Prevention Clause" limiting the contractor's burden to complying with those federal regulations already "issued" at the time of the award. *Id.* at 516-17. In other words, in *Hills Materials Co.*, the scope of the Permits and Responsibilities Clause was limited by another express provision of the contract. Plaintiff has pointed to no such express provision here.[7]

Plaintiff also cites *Appeal of Odebrecht Contractors of Cal., Inc.*, 00-2 BCA ¶ 30,999, 2000 WL 975128 (July 6, 2000) for the proposition that "the Permits and Responsibilities Clause is subject to the Government's contractual obligations of good faith, fair dealing and cooperation." Pl.'s Opp. at 12 (citing *Odebrecht*, 2000 WL 975128 at *30-33).[8] But the

---

[7] The contract does incorporate by reference the Accident Prevention Clause at issue in *Hills Materials Co*. Def.'s Mot. Ex. A1-4 (incorporating by reference FAR § 52.236-13). But that provision has no applicability to amendments to New Hampshire's AOT Permit requirements. The Accident Prevention Clause limits the contractor's responsibility under the Permits and Responsibilities Clause with respect to *federal* regulations, specifically those "issued by the Secretary of Labor at 29 CFR part 1926 and 29 CFR part 1210." FAR § 52.236-13(b)(2); *see also Hills Materials Co.*, 982 F.2d at 516-17. Plaintiff cites no express term of the contract limiting its responsibility for complying with *state* regulations.

[8] Plaintiff also cites *Appeal of ABC Demolition Corp.*, 68-2 BCA ¶ 7,096 (1968), *Appeal of Dravo Corp.*, 79-1 BCA ¶ 13,575 (1978), and *Appeal of Perini, Horn, Morrison-Knudsen*, 87-1 BCA ¶ 19,545 (1987) for the same proposition. It is difficult to comprehend why plaintiff thinks

question here is not whether the implied covenant *applies*, but what it *entails*.  In *Odebrecht*, the board of contract appeals found that the Permits and Responsibilities Clause posed no bar to relief based upon a federal agency's "affirmative actions, which effectively aided and abetted" the denial of a permit.  *Id.*  Indeed, there, the government "*orchestrated* the harsh terms of the permit." *Id.* (emphasis added).  Here, on the other hand, plaintiff is asking the court to find that FBOP essentially had a duty to object to the independent acts of the state of New Hampshire—acts which the federal government did not orchestrate, aid, or abet.  The court can find no such duty embedded within the implied covenant in light of an express term imposing on plaintiff the responsibility for obtaining state permits and complying with state law "without additional expense to the Government."

In short, having expressly assumed responsibility for compliance with New Hampshire law, plaintiff cannot invoke the implied covenant of good faith and fair dealing to shift that responsibility to defendant.  Accordingly, the facts plaintiff alleges do not constitute a claim for breach of the implied covenant upon which relief may be granted.  The court must therefore dismiss Count IV of plaintiff's complaint.

**D. Counts V and VI:  Constructive and Cardinal Change**

Plaintiff also seeks relief under the doctrines of constructive and cardinal change. Compl. ¶¶ 106-117.  To demonstrate a constructive change, a plaintiff must show (1) that it performed work beyond the contract requirements, and (2) that the additional work was ordered, expressly or impliedly, by the government.  *The Redland Co., v. United States*, 97 Fed. Cl. 736, 755-56 (2011) (citing *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 678 (1995)); *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 774 (2005).  A cardinal change is similar, but has two distinguishing features:  (1) a cardinal change requires work materially different from that specified in the contract, and (2) a cardinal change amounts to an actual breach of contract.  *See The Redland Co.*, 97 Fed. Cl. at 755 n.9.

Key to both doctrines is the limitation that the "change" upon which relief is predicated must be imposed as result of the defendant's actions.  As the Federal Circuit has explained,

> [The doctrines of constructive and cardinal change] require record evidence that *[the defendant] demanded* work above and beyond that in the contract.  Equitable adjustments are corrective measures that make a contractor whole when *the Government modifies* a contract.  *Ets-Hokin Corp. v. United States*, 190 Ct. Cl. 668, 420 F.2d 716, 720 (Ct. Cl. 1970). A constructive change occurs where a contractor performs work beyond the contract requirements without a formal order, *either by an informal order or due to the fault of the Government*. *Miller Elevator Co. v. United States*, 30 Fed. Cl. 662, 678 (1994).  A cardinal change is a breach that occurs when the *Government effects a change* in the work so drastic that it effectively requires the contractor to perform duties materially different from those in the original bargain.  *Krygoski Constr. Co., Inc. v. United States*, 94 F.3d 1537, 1543 (Fed. Cir. 1996).

---

these cases support the proposition.  None of them appear to have anything to do with any implied covenant.

*Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007) (emphasis added). Thus, to state a claim for relief under the doctrines of constructive or cardinal change, plaintiff must allege a change effected by defendant, and not by some third party.

Here, however, the changes plaintiff alleges were effected by a third party—the state of New Hampshire. As plaintiff states in the Complaint, any extra work plaintiff had to perform was the result not of defendant's actions, but of "NHDES' [sic] administration of the AOT Permit" and New Hampshire's amendments to administrative rules. Compl. ¶¶ 53, 107-11, 114-17. The doctrines of constructive and cardinal change cannot be invoked against the federal government based upon the New Hampshire state government's actions.

Nor can this straightforward conclusion be evaded by characterizing the Bureau of Prisons's "inaction" as the ultimate source of the change. Pl.'s Opp. at 23 ("A constructive change may arise due the [sic] Government's inaction."). The only authority plaintiff cites for its argument to the contrary is a thirty-year-old Housing and Urban Development Board of Contract Appeals decision which held only that "inaction of a Contracting Officer to take steps to correct a delay *by another contractor*, after due notice and protest by the affected contractor, can constitute change." *Appeal of Altman Carpentry, Inc.*, 81-2 BCA ¶ 15,414 (1981) (emphasis added). But the state of New Hampshire is not a federal contractor.

In the end, plaintiff's argument that a constructive or cardinal change was caused by defendant's "inaction" is just a creative way of trying to evade the central problem with plaintiff's suit: "The Contractor shall, *without additional expense to the Government*, be responsible for obtaining *any* necessary license and permits, and for complying with *any* Federal, State, and municipal laws, codes, and regulations applicable to the performance of the work." FAR § 52.236-7 (emphasis added).

### IV. Conclusion

Because plaintiff has failed to set forth facts sufficient to state a claim for relief predicated upon any theory it has raised, this court must GRANT defendant's MOTION to dismiss. The Clerk is directed to take the steps necessary to dismiss this matter.

**IT IS SO ORDERED.**

*s/ Lawrence J. Block*

Lawrence J. Block
Judge